HAMMOND OIL COMPANY, Appellant, *v.* STANDARD OIL COMPANY, a Corporation of the State of New Jersey, Respondent, Impleaded with STANDARD OIL COMPANY OF BOLIVIA, a Corporation of the Republic of Bolivia, Defendant.

First Department, November 27, 1931.

*Ellwood M. Rabenold* of counsel [*Rabenold & Scribner*, attorneys], for the appellant.

*Clarence J. Shearn* of counsel [*Chester O. Swain*, attorney], for the respondent.

TOWNLEY, J. This action was brought to declare and enforce plaintiff's right to two and one-half per cent of the product of two oil concessions (Ayacucho and Enriqueta) in Bolivia which the defendant is developing through its Bolivian subsidiary. The establishment of plaintiff's cause of action depends upon proving either a contractual or a fiduciary relationship existing between defendant's assignor, Richmond Levering & Company, Inc., and plaintiff's assignor, Imbrie & Company. The relationship between these two assignors arose out of the sale by Imbrie & Company to Richmond Levering & Company, Inc., of an option which Imbrie & Company's representative, Hammond, had purchased from a Bolivian oil prospector named Hoppe. This transfer was accomplished on December 30, 1919, and the rights of the parties must be determined by the agreement of that date as interpreted by a letter dated October 22, 1920, from Richmond Levering & Company, Inc., to Imbrie & Company.

On March 3, 1921, Richmond Levering & Company, Inc., sold all its concessions and options in Bolivia, including the Hoppe option rights, to respondent for $550,000. The agreement by which Richmond Levering & Company, Inc., transferred these concessions to the defendant set forth a copy of the Levering-Imbrie letter of October 22, 1920, and said: " 1. Levering represents that it owns and holds a valid and subsisting option giving it the right to purchase from the owner thereof, on the terms and under the conditions more fully and at large set forth in a copy of said option which is hereto annexed and marked Exhibit ' A ' and in a letter to Imbrie & Co., dated October 22, 1920, copy of which is annexed hereto and marked Exhibit ' B ' * * *."

It is conceded by the defendant that its duty toward plaintiff as assignee of Imbrie & Company's claim is measured by the duty which its assignor, Richmond Levering & Company, Inc., had toward Imbrie & Company.

The evidence must be examined to determine whether the issue as tendered by plaintiff was established. The original agreement of December 30, 1919, between Hammond, representing Imbrie & Company, and Bielaski, representing Richmond Levering & Company, Inc., recited that Hammond had secured an option from Hoppe for the purchase of Ayacucho and Enriqueta, that he had transferred and assigned said option to Richmond Levering &

Company, Inc., and that Richmond Levering & Company, Inc., "their successors or assigns in the lands," undertook to allow Imbrie & Company by way of remuneration for this transfer, the following: "a — 10% of the gross output of any oil or oil products obtained from the lands covered by this option, which oil or oil products shall be delivered at the terminal stations of the oil pipes that are being erected by the Richmond Levering Company for the working of the fields." This ten per cent royalty was later changed by consent to two and one-half per cent. The sum of 15,000 bolivianos was given to Hammond for the execution of the instrument, which Hammond "acknowledges to have received to his entire and complete satisfaction." Richmond Levering & Company, Inc., undertook to have all proper surveys and prospecting carried out by its engineering staff. Hammond retained "the right to have the reports of the engineers of Messrs. Richmond Levering & Company, Inc., tested, and also to cooperate in the surveys and researches through his own personnel at his own costs and at his risks and perils." This agreement was made dependent not necessarily upon the exercise of the Hoppe option but upon the acquisition and development of the properties by Richmond Levering & Company, Inc., their successors or assigns. The contract contains no condition, such as that read into it by the trial court, that the royalty is only payable, "if the option was exercised." By this agreement Imbrie & Company gave to Richmond Levering & Company, Inc., the opportunity to acquire the properties or to exploit them by their own efforts or that of their assigns. The method of exploitation was not specified in the agreement. That this contract was something more than a simple transfer from Imbrie & Company to Richmond Levering & Company, Inc., is indicated by the provisions in the contract under which Imbrie & Company was still permitted to see the reports of geologists and make its own investigation on the property. There would be no purpose in inserting these provisions if a simple transfer were all that was involved.

It is true that the contract does not in terms characterize the relation as that of joint adventure and might be considered ambiguous in that respect. But whatever uncertainty there may have been as to the character of this relationship was completely removed by the agreement as to its construction contained in the letter of October 22, 1920. A controversy had arisen concerning the propriety of the cancellation of the first option and the rights of Imbrie & Company in the new option and generally under their contract.

In this connection on October 22, 1920, Imbrie & Company

wrote Richmond Levering & Company, Inc., as follows: "We appreciate your expression of intention to proceed in this matter upon the basis of the negotiations and contract between us notwithstanding any conduct of the parties in Bolivia, but we do think this should be made quite clear, and we wish therefore that we might receive a declaration from you that any instrument or instruments of cancellation which may have been executed by yourselves or in your name and delivered in Bolivia or elsewhere relating to the option forming the subject matter of the contract between us, shall not in any wise be deemed to affect or impair the contractual obligations between us, and that in any development of the enterprise, whether in exercise of the option or consequent upon the option, our participation as agreed upon between us to the extent of not less than two and one-half per cent of the brute product of petroleum or its derivatives shall be recognized.

"We should like to add that in asking that our relationship be expressed in such definite written terms, we are considering simply that as a business matter it should be placed upon a definite, understandable business basis, without in any wise questioning the sincerity and splendid cordiality of your dealings with us."

Replying to this, Richmond Levering & Company, Inc., October 22, 1920, wrote as follows: "I am just in receipt of your letter of October 22, 1920.

"I do not recall that I mentioned to Major Imbrie that a formal written cancellation had been executed. What I meant to convey to him was that a new deal had been made with Hoppe by our representative in Bolivia, the details of which were on the way here and that he should understand that nothing in this new deal was to be in any way prejudicial to the rights of your company.

"I am not prepared to discuss with you the question of the necessity or propriety of executing the cancellation of the first option in view of the taking of a new option, because this action was taken by our representative in Bolivia without notice to us and after advice from us that we did not consider the option as having expired.

"I, nevertheless, have confidence that our representative believes that he has made a more advantageous deal for us under the new arrangement than under the former arrangement, and, while he may not be advised of the fact, any arrangement which is more advantageous to us must, *in view of our understanding with you,* be also advantageous to you.

"I am very glad to assure you that any instrument or instruments of cancellation executed by us or in our name and delivered in

Bolivia, or elsewhere, relating to the subject matter of the contract between us shall not in any way be deemed to affect or impair the contractual obligation between us, and that *in any development of the enterprise, whether in exercise of the option or consequent upon it, your participation as agreed upon between us shall be recognized* to the extent of not less than two and one-half per cent of the brute product of petroleum or other hydrocarbons.

" We have not in our dealings with you undertaken to proceed upon what may be the strict legal rights of your company and our company. Perhaps as has been suggested under the contract between us, you would have no rights after the expiration of the option which you sold to us. We might be free, in a strictly legal sense, to go ahead and make a new deal with Mr. Hoppe.

" On the other hand, *we feel that we went into this deal in good faith with you as participants, and in addition, Mr. Hammond has stated that our representative in La Paz made agreements with respect to the exercise of this option which does not appear in the contract itself.* It has been, and is, our purpose, therefore, to deal with you frankly, endeavoring to see that no advantage of any kind is taken of you but *to look after your interests as well as our own in any working out of this situation,* and if you feel that any more formal undertaking is desirable from your standpoint than this letter, I will be glad to discuss it with you." (Italics our own.)

This letter not only construed Imbrie & Company's rights under the original contract but when taken in connection with the surrounding circumstances brought into being a new contract. At the time this letter was written a question had arisen whether the original option was still in force. Richmond Levering & Company, Inc.'s agent, while this dispute was pending, had consented to a cancellation of the old, and had negotiated a new option. Richmond Levering & Company, Inc., had suggested that Imbrie & Company's rights were restricted to the original option and that the latter had no rights under any subsequent options. Imbrie & Company was at that time in a position to contest these hostile claims and to take both business and legal action to protect and enforce its claimed rights. It could have questioned the termination of the original option, treated it as still in force, and held Richmond Levering & Company, Inc., responsible for its cancellation; it could have treated the new concession as within the terms of its original contract and brought action to establish and enforce its claims; it could also have gone into the market and engaged in active competition with Richmond Levering & Company, Inc., for these properties. The surrender of these rights asserted in good faith by Imbrie & Company constituted ample consideration for the

agreement contained in the letter of October twenty-second. (*Feeter* v. *Weber*, 78 N. Y. 334.) By this agreement the status of Imbrie & Company as a coadventurer with Richmond Levering & Company, Inc., was definitely established. As such both were bound to exercise the utmost good faith, and neither could profit at the expense of the other.

The situation here is essentially like that considered by the Court of Appeals in *Meinhard* v. *Salmon* (249 N. Y. 458). In that case Meinhard and Salmon were joint owners of a lease. Near the end of the term Salmon had an opportunity to secure a new lease involving the original property and some adjoining parcels. Salmon without the knowledge of Meinhard negotiated such lease for himself. He was held to have taken this lease as trustee for the joint account of himself and his coadventurer and required to account to Meinhard for the proceeds of that transaction. The court in its opinion (at p. 462) says: " The two were coadventurers, subject to fiduciary duties akin to those of partners ( *King* v. *Barnes*, 109 N. Y. 267). As to this we are all agreed. The heavier weight of duty rested, however, upon Salmon. He was a coadventurer with Meinhard, but he was manager as well." So in the instant case the greater obligation rested upon Richmond Levering & Company, Inc., who managed the joint venture and specifically undertook to represent Imbrie & Company's interests in the negotiations concerning the option or consequent upon the option.

Defendant further relies upon the fact that the property was never bought under any of the options. We think this is too narrow a view to take of the transaction.

The last of the options expired on June 1, 1921, but the expiration of this option had no effect on the continuity of defendant's efforts to secure these properties. Defendant had determined more than a year prior to this to acquire them. In all this period the only question was one of price. As far back as May 15, 1920, defendant had entered into a joint venture agreement with Richmond Levering & Company, Inc., to acquire and exploit all their Bolivian concessions. On March 3, 1921, defendant had purchased all of Richmond Levering & Company, Inc.'s concessions, including its option on the Hoppe interests. For the Hoppe option it had paid $170,000, subject to whatever interest remained in the plaintiff. In April of 1921, having acquired these options, defendant determined to purchase the properties, independent of the option, at a reduced price. It sent its representative (Moreno) to Bolivia to accomplish this. In May, 1921, Moreno offered one dollar per hectare. Shortly after this offer was made, Moreno died. This delayed defendant's plans. Defendant determined not to

renew the option which expired on June 1, 1921. It instructed Richmond Levering & Company, Inc., not to advise Hoppe of this intention, however, and specifically requested it to let the matter rest *in statu quo* so that defendant's representative might have an opportunity to discuss the option with Hoppe at La Paz. After the expiration of this option, Hoppe cabled Richmond Levering & Company, Inc., inquiring if it had no further interest in the concession. Richmond Levering & Company, Inc., at the defendant's suggestion, cabled: " Two representatives on way to La Paz. Will take up questions options your concessions * * *." This cablegram definitely connects the options with the negotiations thereafter carried on. The two representatives referred to were Armstrong and Bingham who left New York June fourth. Upon their departure Richmond Levering & Company, Inc., cabled Hoppe, who at that time thought he was still in its employ, " Cooperate with Armstrong and Bingham in every respect and act in obedience to their wishes." Armstrong arrived in August. Hoppe asked him to better the offer of one dollar per hectare. Armstrong refused. Hoppe made abortive efforts to sell to someone else and then accepted Armstrong's offer in September. Hoppe's partner in Paris, however, objected to the price, which was subsequently advanced to meet his demand. The purchase was closed in October.

It is apparent that defendant in May, 1921, considered that these options had served their purpose as a step in the negotiation. Defendant by that time had by large purchases of surrounding oil properties rendered Hoppe helpless, so that a sale to any one other than defendant was difficult, if not impossible. It purposely allowed the option to expire so that Hoppe might realize the helplessness of his position, and that it might be able to purchase at the price it had determined to pay for the properties. But that defendant, meanwhile, recognized its obligation to Imbrie & Company as continuing appears in a letter of instruction of April 5, 1921, to its agent Moreno wherein it was stated: " The royalty payable to Imbrie & Co. was reduced by Levering to two and one-half per cent * * *. In principle we are willing to assume this royalty if it is necessary." There never was any break in defendant's " continuous pursuit " of the object of this joint venture, nor any thought that plaintiff's assignor was not interested in the outcome.

The legal doctrine of " continuous pursuit " has been best developed in *Valdes* v. *Larrinaga* (233 U. S. 705). The facts of that case are strikingly like those before us. In the *Valdes* case the actual partnership was in doubt, as here, but the Supreme Court of the United States held that none the less a participation

agreement was in existence which entitled claimant to a share in the profits when they came into being. (Compare *Barnes* v. *Alexander*, 232 U. S. 117.) In the *Valdes* case also the original grant had been forfeited. This fact parallels closely the expiration of the Hoppe options from time to time. But defendant before us urges that, since Hoppe had complete *theoretical* freedom of action to sell to whom he pleased for a short period in December and January, 1920–1921, and after June 1, 1921, the final purchase was not " consequent on the option." In the *Valdes* case the Porto Rican authorities similarly had a period of time after the forfeiture in which the grant could have been made to a stranger. That fact made no difference. Mr. Justice HOLMES said: " And while it may be true that the sale would not be likely to have taken place without a confirmation or regrant of the franchise, still, as between these parties, it seems fairly probable that there was a continuous pursuit of the end; that, while the franchise gave the value to the land, the land gave a *locus standi* to the franchise * * *." In the case at bar it is more than fairly probable that the Hoppe properties were continuously pursued, and the existence of the options gave a *locus standi* to defendant's plan to trade on them and preferably to let them expire, not to defraud plaintiff, but to make a better bargain with Hoppe. The repudiation of the " moral obligation," as defendant calls it, admitted in the letter of October 22, 1920, was doubtless an afterthought. But " moral obligation" though it be, there is also a legal sanction. Fiduciary duties cannot be evaded by changes in the course pursued or in the result obtained. (*Brown* v. *Leach*, 189 App. Div. 158, 163; *Meinhard* v. *Salmon*, *supra; Lonabaugh* v. *Midwest Refining Co.*, 285 Fed. 63.)

The judgment should be reversed, with costs, and judgment directed for plaintiff as prayed for in the complaint, with costs.

FINCH, P. J., and O'MALLEY, J., concur; MERRELL, J., dissents.

Judgment reversed, with costs, and judgment directed for plaintiff as prayed for in the complaint, with costs. Settle order on notice. The findings inconsistent with this determination should be reversed and such new findings made of facts proved upon the trial as are necessary to sustain the judgment hereby awarded.